

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-13-00204-CR

LORENZO CECIL GRAVES, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 47th District Court
Randall County, Texas
Trial Court No. 23,535-A, Honorable Dan L. Schaap, Presiding

March 5, 2014

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Appellant, Lorenzo Cecil Graves, appeals his conviction for continuous sexual abuse of a young child. Through a single issue, he contends that the trial court erred in admitting a video tape of an interview wherein the child discussed what had been done to her by appellant. According to appellant, the video was inadmissible under Texas Rule of Evidence 801(e)(1)(B), and its admission (given that violation of the evidentiary rule) violated his rights to due process and equal protection of the law. We overrule the issue and affirm.

For purposes of disposing of the appeal, we assume *arguendo* that appellant preserved his complaint. Next, we review the issue under the standard of abused discretion. *Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007). That standard obligates us to leave the trial court's ruling alone so long as it falls within the zone of reasonable disagreement. *Benitez v. State*, 5 S.W.3d 915, 918 (Tex. App.—Amarillo 1999, pet. ref'd).

Rule 801(e) is entitled "Statements Which Are Not Hearsay," and 801(e)(1)(B) states that a prior statement by a witness is when "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is: . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." TEX. R. EVID. 801(e)(1)(B). Appellant contends that pursuant to this rule, the submission of the prior recorded interview of the child/witness in "its entirety, even without an attempt to edit to specific instances of consistent testimony," is error and denied appellant both due process and equal protection of law. This is so because there is a question on whether "the trial testimony of the child/witness was truly impeached."

Excerpts from the reporter's record prove appellant's contention to be inaccurate. For instance, on cross examination, trial counsel asked the child victim the following questions:

Q.     Okay. And January 21st of -- of -- of 2012 -- you first said 2010, then '11, and then corrected yourself to '12. Is that correct?

A.     Yes.

2

Q. Okay. Now, how often would you go see -- how often would you go see your dad?

A. Only in the summer.

Q. Okay. So during the regular year you lived here?

A. Yes.

* * * * *

Q. Okay. All right. At any point did you ever want your mom and dad to get back together?

A. When I was little, yeah.

Q. Why?

A. Because I wanted my dad in my life.

Q. Okay. Okay. Do you have a good relationship with your dad?

A. Yes.

Q. How was your -- do you -- how was your relationship with your mother?

A. Good.

Q. Okay. How do you like Chad? [her mother's boyfriend]

A. He's good.

Q. Okay. Did it ever cause you any concern with another guy moving into the house with you? Does that cause you some fear?

* * * * *

Q. Okay. Now, there was a couple of times that you say that -- that these exercises [sexual contacts] occurred, but you can't remember exactly when. Is that a fair statement?

A. Yes.

* * * * *

3

Q.   Okay. When you were writing your statement, did anyone -- did – did anyone ever -- did you have any questions about what might need to go in the statement and ask any questions to either your mom or the police officer?

A.   Yes.

Q.   Okay. And did -- did -- who -- who told you how to fill out the top of the form?

A.   The police officer.

Q.   Okay. Now, did you -- did you fill that in or did he fill that in?

A.    I did.

Q.   Okay. All right. And I'm assuming that he didn't just say, just start writing a statement. That you had to ask some questions about how to write the statement. Correct?

A.   Yes.

Q.   Okay. Who did you ask those questions?

A.   The police officer.

* * * * *

Q.   Okay. All right. And at that point, the police officer tells you what to put on the top of the form. Correct?

A.   Yes.

Q.   Okay. And at some point -- I'm assuming you didn't just start writing, did you?

A.   No.

Q.   Okay. Who did -- who did -- who's the first person you asked to say, hey, how do I do this?

A.   The police officer.

* * * * *

4

Q. And -- and you received assistance during this statement on -- on kind of -- some help on that. Is that right?

A. Yes.

* * * * *

Q. Okay. All right. And did your mom help as well -- help you fill out the statement with the police officer?

A. Yes.

Q. Okay. And did she help the police officer with the dates and stuff?

A. Yes.

* * * * *

Q. Okay. Now, you went down to Austin and stayed and then finally -- and then you came back up here. Is that right?

A. Yes.

* * * * *

Q. Okay. Have you talked to any other counselors or anybody else about this case other than what you and I have already talked about?

A. Yes.

Q. When was that?

A. It was after we went to the Bridge.

Q. Okay. Do you remember where that was?

A. I don't remember where. It was like a place like -- I don't know, Jennifer or whatever.

Q. Okay. Do you still talk to Jennifer?

A. My mom was thinking about it.

Q. Okay. When was the last time you saw Jennifer?

5

A.    Before I left to Austin.

Q.    Okay. How long ago was that?

A.    I don't know.

Q.    Okay. How many times did you see Jennifer?

A.    About three times.

Q.    Okay. Is there any reason -- did you want to stop seeing Jennifer?

A.    No.

* * * * *

Q.    Okay. All right. And from what I gathered from what you said, do you -- do you -- do you remember ever telling Chloe [the Bridge interviewer] that his boy part ever touched your skin?

A.    No.

Q.    Okay. And you said the slimy stuff was yellow?

A.    Yes.

Q.    Not white?

A.    No.

State's redirect:

Q.    Okay. Did you make all this up about your stepdad Lorenzo so your parents would get back together?

A.    No.

Q.    Do your mom and dad even talk to each other?

A.    Sometimes.

Re-cross:

Q.    I just have -- I have some questions about something. Now, you had mentioned that -- something about contacts. Okay? Do you remember that conversation just a second ago?

A.    Yes.

Q.    I assume you do.  And my question is to you, when you talked to the people at the Bridge and you talked to the police officer and in your original testimony about what happened, you -- you never told anybody anything about contacts, did you?[1]

A.    No.

Q.    The first time you said anything about contacts is when -- is when the -- the other attorney said that, isn't it?

A.    Yes.

* * * * *

Q.    Okay. So it's your -- you're telling this jury at no time you've ever told your mother about all the exercises or about anything like this?

A.    I told her about all the exercises, just not when some of it all happened.

At closing argument, defense counsel also argued, among other things, that the victim's description of the "slimy yellow substance" which she discovered between her legs was a "small detail . . . [m]aybe a detail *a lawyer* would think of . . . it's a small detail that for some reason struck me as unusual."  (Emphasis added).  The "lawyer" to which appellant alluded was the prosecutor.

At the very least, reasonable minds could interpret the foregoing exchange as effort by the defense to suggest that the child victim 1) had been coached by the police, her mother and the prosecutor, 2) fabricated for or provided to the jury a version of the events differing from what she originally told the police and Bridge interviewer at the first

---

[1] The victim testified that appellant told her if she "[did the exercises] one more time he [would] buy the [contact lenses] for [her]."

7

outcry, and 3) so fabricated her testimony for the purpose of rejoining her mother and father. Indeed, that seemed to be how the trial court viewed the exchange in deciding to admit the evidence. Its statement that ". . . certainly there has been a line of questioning in the issue of the veracity, the credibility of the testimony we've heard thus far and whether it's been influenced, et cetera has been put into play" illustrates as much. And, we must defer to the trial court, who is able to observe "the tone and tenor of the questioning, combined with the cross-examiner's demeanor, facial expressions, pregnant pauses, and other nonverbal cues." *Hammons v. State*, 239 S.W.3d 798, 808 (Tex. Crim. App. 2007) (also stating that in assessing whether cross-examination of a witness makes an implied charge of fabrication or improper motive, the trial court considers not only the totality of the questioning but also may consider clues from *voir dire, opening statements and closing arguments*) (Emphasis added).

As for the suggestion that the State failed to show the prior consistent statement was made before the motive to fabricate arose, such is an element of Rule 801(e)(3)(B). *Houghton v. State*, 805 S.W.2d 405, 407-408 (Tex. Crim. App. 1990). And, as mentioned above, defense counsel's cross-examination of the victim followed by his comment during summation about a "detail a lawyer would think of" could reasonably be construed as suggesting that the prosecutor influenced the victim's testimony. Given that the video memorialized statements made long before trial, there existed basis upon which the trial court could have reasonably determined that the comments preceded the prosecutor's supposed effort to influence the victim. *See Martinez v. State*, 276 S.W.3d 75, 82-83 (Tex. App.—San Antonio 2008, pet. ref'd) (so holding under like circumstances).

The deference we must afford the trial court and the circumstances of record preclude us from holding that the trial court abused its discretion in admitting the video. Accordingly, the judgment of the trial court is affirmed.

Per Curiam

Do not publish.